(C.D. 2484)

W. KAY COMPANY, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided October 14, 1964)

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt, Majorie M. Shostak,* and *M. Barry Levy* of counsel) for the plaintiffs.

*John W. Douglas,* Assistant Attorney General (*Sheila N. Ziff, Morris Braverman,* and *Harold L. Grossman,* trial attorneys), for the defendant.

Before DONLON and RICHARDSON, Judges

RICHARDSON, Judge: The merchandise involved in this case consists of teacups and saucers, imported from Japan in 1958, and assessed with duty as decorated china tableware at 60 or 45 per centum ad valorem and 10 cents per dozen pieces under paragraph 212 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, or the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865, effective September 10, 1955, T.D. 53877. It is claimed that the merchandise is not tableware and is properly dutiable under said paragraph 212, as modified, at 45 per centum ad valorem.

Samples of the merchandise involved herein were received in evidence as plaintiff's collective exhibit 2 and an illustration as plaintiff's collective exhibit 1.

Plaintiff's collective exhibit 2 consists of 8 cups and saucers, very elaborately decorated in bright colors with a lustrous glaze and a considerable quantity of gold. The cups are decorated both inside and outside, some with irridescent colors and some with ornate fruit or flower patterns. Some of the cups are in the usual teacup shape but others are higher or more rounded or fluted. Some are footed. Six of the saucers have open work in the rim portion. Some of the cups do not fit into the saucer well snugly.

Plaintiff's collective exhibit 1 consists of two sheets of illustrations of cups and saucers including those of the type involved herein. They are shown in cup and saucer racks with the saucer upright and the cup placed in front of it.

At the trial, plaintiff called the following ten witnesses:

1. Boris B. Levitt (erroneously referred to as Boris B. Fevitt in the transcript), president of W. Kay Company, Inc., the plaintiff herein. He had been president of the company for 3 years and prior to that had been treasurer beginning in 1946. The company is an importer of novelties and gift items from Japan. Since 1948, the witness had gone to Japan several times a year and had designed and purchased merchandise there.

2. Alex M. Satler, presently in the wholesale business, who had been in the retail business, as merchandise manager of home furnishings with Lit Brothers, Philadelphia, for 4 years prior to 1958. During that period he had purchased merchandise similar to that involved herein from W. Kay Company, Inc., and other firms.

3. Mrs. Louise Bergen, a buyer of gift items for Loft Candy Co. She had purchased merchandise like that involved herein from W. Kay Company, Inc., since 1958, in an aggregate quantity of 50,000 to 60,000 cups and saucers.

4. H. A. Lipper, sales manager of Lipperman, Inc., an importer of fancy goods. His firm had imported articles similar to those involved herein for the last 10 years in quantities exceeding a thousand dozen a year. He has been sales manager of the company since 1945 and travels about the country to showrooms in Atlanta, Chicago, Dallas, and California. He sells to every state in the Union, to J. C. Penney, Sears Roebuck, Belt Department Stores, and other large interstate distributors.

5. Mrs. Carla Rogers, housewife, who had seen articles like those involved herein on display all over; she could not recall ever not having seen them.

6. Morton Sills, sales manager of W. Kay Company, Inc. He had been with the company for 10 years and was familiar with articles like those involved herein. He had sold them in about 40 states including Washington, Oregon, California, Texas, Florida, Illinois, Minnesota, Massachusetts, Connecticut, North Carolina, Georgia, Alabama, Ohio, Oklahoma, Kentucky, Colorado, Utah, and Maine.

7. Irwin M. Randolph, District Manager for Northern California of National Silver Co. His duties are primarily to sell merchandise and direct the activities of others who work under him. He is a member of the Executive Merchandising Committee of National Silver Co., which meets twice a year to select patterns and types of merchandise. He was familiar with merchandise like that involved herein through selling and handling it for the past 10 years. His firm had imported an average of 10,000 dozen of similar items per year for the past 10 years. He identified photographs of articles imported by his firm, which were received in evidence as plaintiff's exhibits 4, 5, and 6. The items illustrated are elaborately decorated teacups and saucers similar to those in plaintiff's exhibits 1 and 2. In plaintiff's exhibit 5 they are displayed in cup and saucer racks.

8. Fred Holzinger, manager of the gift and souvenir shops at Cliff House, a tourist attraction in San Francisco visited by about 8,000 people a day. He had been manager of the seven shops for 4 years, prior to which time he had been store manager and assistant store manager of Dohrman's stores in San Francisco, Beverly Hills, and Los Angeles. He was familiar with the type of merchandise involved herein through having bought and sold it for many years.

9. Philip W. Fry, sales representative for United China & Glass Co. in Southern California and Arizona. He had been with that company for 5 years, prior to which time he had been employed by

George Borgfeld Corp., as salesman in about the same territory; and prior thereto by F. C. Nasch Co. Stores, Pasadena, Whittier, and Arcadia, Calif.; Good Housekeeping Shops of Texas; and Joske's of Houston. He became familiar with the type of merchandise involved herein as a buyer and as a wholesaler.

10. Louis S. Lane, supervisor for Kay Jewelry Stores in Southern California. That firm has 22 stores in California which retail jewelry, watches, diamonds, porcelain, and giftware items and dinnerware. His duties include visiting the stores and supervising and making sales. He has been familiar with merchandise like that involved herein for 8 years.

Mr. Levitt testified that he had placed orders for this class of merchandise since 1951, at which time he became aware of the sales demand for it through a customer who was a buyer from Detroit. She suggested that teacups and saucers with fancy decorations be made in different shapes and colors in more numbers to retail for a dollar. According to Mr. Levitt, "we took some of the merchandise we had on hand which cost us more, some of it less, and shipped it out as a trial basis, and sure enough, that started the whole thing." Other testimony herein indicates that this type of merchandise was sold at retail at from 59 cents to about a dollar per cup and saucer.

This merchandise was purchased in assortments of shapes, decorations, and colors and the patterns were changed once or twice a year. These changes were made to satisfy the demand of customers who came in looking for something new. Where a pattern did not sell, it was dropped, but some patterns were continued. If the patterns were not changed, sales would have tapered off and stopped.

The merchandise was packaged for sale to the retailers in varying quantities, but always in assortments of patterns: Cartons of 8 or 12 cups and saucers, all assorted, no 2 cups and saucers being identical; packages of 6 assorted shapes and colors, with 4 to 8 packages in a master carton; assortments of 12 to a box and 8 boxes to a carton, with no 2 cups and saucers identical; 6 dozen to a case, one each of 6 styles to a box or a larger package of 12 different patterns to the case; assortments containing 100 or 144 cups and saucers with an assortment of all different kinds of cups and saucers; or 1 of each of 12 numbers or 2 each of 6 numbers, usually packed 6 to 12 dozen per carton. One witness testified that originally the merchandise was purchased in a large pack holding 30 dozen, but that it was now purchased in a 6-dozen pack, in order to gain a broader distribution. Plaintiff's exhibit 4 was a package of six cups and saucers, each of a different design and was created as a premium item to be used as a gift in conjunction with a larger sale, by a jewelry store or a furniture store.

This merchandise was exhibited in stores by a mass display of a wide selection of teacups and saucers usually in a traffic area or in the stationery, notions, or giftware departments, or in a show window. In some cases it was displayed on cup and saucer racks. Such merchandise is designed and sold for giftware and traffic sales areas as an impulse item that is purchased as a souvenir or a gift. It has been sold at trade shows to buyers from Alaska to Miami, from all states and all types of stores. In San Francisco, it is sold to shops at Fisherman's Wharf and Chinatown and to the finest department stores, such as the Emporium, Whitehouse, and Dohrman's Union Square. Sometimes wooden stands are sold with the cups and saucers or inexpensive plastic stands are given away with the merchandise. In the experience of one witness, the open work sets and footed sets were the most popular.

Merchandise such as that involved herein is usually sold in quantities of a single cup and saucer of a particular design. Many times purchasers indicate that they are adding them to a collection or buying them for someone else's collection. Sometimes a quantity will be purchased for gifts at Christmas time.

According to Mr. Lipper, dinnerware consists of plates, cups, and saucers and accessory service pieces, all of one decoration and in a utilitarian shape, and is definitely unlike the cups and saucers involved herein. While he had seen highly ornate patterns in dinner sets, he said that they were the least desirable and that his firm did not carry them. By "ornate" he meant that the decorations on the ware were ornate, but usually the shape of the ware was quite simple. He sold tea service sets, consisting of six cups and saucers, a pot, sugar and creamer, and sometimes six matching plates, which did not always match a dinnerware set, but were all of one decoration. Mr. Holzinger pointed out that dinnerware was usually sold in place settings or in services of 4, 6, 8, or 12 place settings, but that no plates, teapots, sugar and creamers were purchased to match cups and saucers like those involved herein. Mr. Fry stated that the stores he was associated with in Texas and California did not carry other items to match this type of cup and saucer. The witnesses stated that dinnerware is not usually sold to the same establishments that carry these cups and saucers and that it is displayed in a different section of the store, on tables with silverware or in place settings.

This type of merchandise had been sold to Loft Candy Co. for use as containers of candy. According to Mrs. Bergen, such cups and saucers were sold by that company tied with a ribbon to a little box of candy. A sample of such merchandise was received in evidence as plaintiff's illustrative exhibit 3. The cup is of the same type of highly decorated ware as the imported merchandise.

This type of cup and saucer was also sold to florists for use with floral arrangements or as planters.

The witnesses testified that they had seen such merchandise, in homes which they had visited, displayed on knickknack or whatnot shelves, cupboards with glass doors, breakfronts, and living room tables or used as planters or to hold cigarettes or candy. In some instances, the cups were displayed on wooden or plastic stands or the saucer was on a wooden pedestal with the cup placed before it. None of the witnesses, except Mr. Lipper, had seen them used in the service of a meal. When Mr. Lipper was asked whether he had ever seen these articles used on a table in the service of a meal, he said, "Oh, it might have been a very rare exception, because generally speaking these were used for display purposes." Mrs. Rogers testified that not many of her friends collect such inexpensive items of merchandise for display but use them for planters. However, some of her acquaintances used them for display and she keeps one because it has a sentimental value. Mr. Fry had seen complete cabinets built especially for a big collection of such cups and saucers of different designs. Mr. Holzinger had at one time had a display of cups and saucers in his own home on a huge knickknack shelf.

The witnesses had observed this type of merchandise in homes in the following areas: Elizabeth, N.J., and Philadelphia, Pa. (Satler); Westchester County, N.Y. (Bergen); Charlotte, N.C., Atlanta, Ga., Dallas, Tex., Chicago, Ill., Minneapolis, Minn., Los Angeles, Calif. (Lipper); New York and Ohio (Rogers); Long Island, N.Y., and Detroit, Mich. (Sills); San Francisco, Calif. (Randolph, Holzinger); Houston, Tex., Pasadena, Long Beach, and Los Angeles, Calif. (Fry). Mr. Fry testified that he had visited 24 or 25 homes in Houston and had seen such items used for display in 75 percent of them. He had seen them in 25 homes in Pasadena, 5 to 10 in Los Angeles, and 15 to 20 in Long Beach.

Mr. Lipper testified that one could drink tea out of some of the cups in plaintiff's collective exhibit 2, but not all of them. Some had very uneven edges and he thought it would be difficult to drink from them without spilling the tea. Mr. Randolph stated that articles such as these were not suitable for daily use because they are very fragile, the decoration is impermanent, and since the paint is applied over the glaze, the action of soap or a detergent would remove it in a very short time. According to this witness and to Mr. Holzinger, in dinnerware, the design is more permanent, and the body is heavier so that it will sustain daily or frequent usage. The patterns in dinnerware are applied under the glaze, whereas in the articles in plaintiff's collective exhibit 2, a decal is applied over the glaze. Therefore, the

pattern will not hold up in dishwashers or even in plain washing over a period of time. These items are fussy and dinnerware is plainer and more tranquil in feeling when set on a table.

The issue before the court is whether or not this merchandise is properly classifiable as tableware. The pertinent provisions of the Tariff Act of 1930, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865, effective September 10, 1955, T.D. 53877, are as follows:

[Par. 212.]

China, porcelain, and other vitrified wares, * * * all the foregoing, whether plain white, painted, colored, tinted, stained, enameled, gilded, printed, or ornamented or decorated in any manner, and manufactures in chief value of such ware, not specially provided for:

    Tableware, kitchenware, and table and kitchen utensils, not containing 25 per centum or more of calcined bone:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

        Other than hotel or restaurant ware or utensils:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

            cups, valued over $1.35 but not over $4.45 per dozen;

            saucers, valued over 90 cents but not over $1.90 per dozen; and

            articles which are not plates, cups, or saucers and which are valued over $4.50 but not over $11.50 per dozen articles;

            all the foregoing_____ 10¢ per doz. separate pieces and 60% ad val.

            Plates of the diameters specified heretofore in this item, cups, saucers, and articles other than plates, cups, and saucers; each of the foregoing which is valued at not more than the minimum value specified heretofore in this item in respect of the like article. 10¢ per doz. separate pieces and 45% ad val.

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

    Articles which are not tableware, kitchenware, table or kitchen utensils, or chemical stoneware, and which do not contain 25 per centum or more of calcined bone. 45% ad val.

In the leading case of *United States* v. *Butler Bros.*, 33 CCPA 22, C.A.D. 310, it was held that in using the term "tableware" in paragraph 212, Congress intended to provide for only such articles as were chiefly used upon a table in the service of meals and that it was not intended to cover novelty articles, such as bonbon and candy dishes, which were not chiefly used in the service of meals, but which were used on bridge tables and occasional tables for serving candy and nuts after a meal.

Articles which have been held not to be tableware within the meaning of paragraph 212 include certain after-dinner coffee cups and

saucers, wall plaques, "Tom and Jerry" mugs, ginger jars and bowls, bonbon dishes, shaving mugs, toothpick holders, and miniature teapots, coffeepots, and pitchers. *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company*, 47 CCPA 1, C.A.D. 719; *A. Jaller Co.* v. *United States*, 37 Cust. Ct. 439, Abstract 60413; *United China & Glass Co.* v. *United States*, 39 Cust. Ct. 167, C.D. 1920; *M. Seller & Co.* v. *United States*, 66 Treas. Dec. 762, T.D. 47417; *Ignaz Strauss & Co., Inc.* v. *United States*, 15 Cust. Ct. 226, Abstract 50327; *The Baltimore and Ohio Railroad Company* v. *United States*, 33 Cust. Ct. 309, Abstract 58248; *P. Kuch Co.* v. *United States*, 65 Treas. Dec. 1376, Abstract 27378; *M. Pressner & Co.* v. *United States*, 2 Cust. Ct. 763, Abstract 41652; *Marks & Rosenfeld, Inc.* v. *United States*, 7 Cust. Ct. 233, Abstract 46139.

In *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company*, *supra*, the merchandise consisted of china after-dinner coffee cups and saucers, some in conventional shapes and some having footed bases or scalloped or fluted rims, ornately decorated in various colors, with a considerable quantity of gold, some in floral and fruit patterns and some with more abstract motifs. Some of the cups were decorated on the inside as well as on the outside. The court held that they were not classifiable as tableware, relying on the following factors: Evidence that a fad of collecting after-dinner coffee cups and saucers for ornamental purposes had developed; that sales had increased tremendously; that designs were changed every 6 months to promote sales; that the merchandise was sold in assortments of different shapes and decorations; that it was customary for a purchaser to buy one, two, or three cups and saucers within a price range of 35 to 89 cents per cup and saucer; that the items did not match dinnerware sets and were not displayed in departments which featured dinnerware sets; that no coffeepots, sugar bowls, or cream pitchers were included in the cartons containing the merchandise; that the merchandise was purchased for use chiefly for decorative purposes; and that frequent washing would cause the decorations to become indistinct. The court stated (p. 6):

Predicated upon a variety of factors including the shapes, designs, and quantities in which the articles were sold, the novelty departments and types of stores which handled the merchandise, and the vast increase of sales of "after-dinner coffee cups," we find that the preponderance of the evidence supports appellee's contention that the subject importation is of a class whose chief use is as ornamental or decorative ware rather than "tableware," as used in the applicable exception set forth in GATT.

All of the factors present in that case are present in the instant one except that the evidence of a fad of collecting this type of teacup and saucer and a consequent increase in sales is not so detailed. However,

Mr. Levitt did state that the sale of this merchandise in assortments had commenced in 1951 at the suggestion of a customer and that that method of merchandising had started a trend. In *The Baltimore & Ohio R.R.* case, there was some evidence that the merchandise was chiefly used for drinking coffee, but in the instant case, there is no such evidence. All of the testimony is to the effect that this merchandise was bought, sold, and used for ornamental purposes or as planters or for holding candy, but not for serving beverages. An examination of the sample cups and saucers indicated that they are not of the type which would be used ordinarily for serving tea. The footed cups do not fit into the saucer wells and would slip when carried, thus spilling the drink; many of the saucers have open work in the rim portion, making it likely that any liquid spilled on the saucer would drip onto the table; the decorations would fade or disappear with frequent washings.

In the recent case of *United States* v. *Bruce Duncan Co., Inc., a/c Kasuga Sales, Ltd., National Silver Company*, 50 CCPA 43, C.A.D. 817, wherein it was held that "decorated porcelain snack sets" were classifiable as tableware, the court pointed out that in *The Baltimore and Ohio R.R.* case:

* * * the preponderance of evidence supported the importer's contention "that the subject importation is of a class whose chief use is as ornamental or decorative ware rather than 'tableware,' * * *." This case lends no support to the importer's position because in the present appeal, there is no assertion by the importer that the chief use of the "snack sets" is as ornamental or decorative ware.

In the instant case it is contended and the evidence supports the contention that the merchandise is decorative ware rather than tableware.

Defendant presented no evidence as to the use of this merchandise but relied upon the presumption of correctness attaching to the collector's classification. This presumption cannot be regarded as having evidentiary value so that it may be weighed against the evidence introduced by plaintiff. *Marshall Field & Co.* v. *United States*, 20 CCPA 225, T.D. 46037; *United States* v. *Ignaz Strauss & Co., Inc.*, 37 CCPA 48, C.A.D. 418. If the plaintiff has presented sufficient proof to establish *prima facie* that the within cups and saucers are not of the class or kind chiefly used as tableware, the protest should be sustained. *Marshall Field & Co.* v. *United States, supra.*

In the *Ignaz Strauss* case, the question was whether certain plastic combs with silver trim were classifiable as jewelry or as articles designed to be worn or carried on or about or attached to the person. Only one witness was called but he testified without contradiction that the only type of trade which bought such article was the jewelry

trade; that the combs were worn in the hair as ornaments; and that he had never seen them used to comb the hair. It was not disputed that the article was a comb, but the court held that the appellee had made out a *prima facie* case to the effect that the type of comb involved was an article of jewelry.

In the instant case, although the merchandise consists of cups and saucers and although cups and saucers are ordinarily regarded as tableware, its classification depends upon chief use, not its inherent nature or nomenclature. *United States* v. *The Friedlaender Co.*, 21 CCPA 103, T.D. 46445; *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company, supra.*

Plaintiff has established *prima facie* that the type of cups and saucers involved herein are used for display and not for serving beverages. The witnesses who testified had seen the merchandise so used in various parts of the country. They had sold it in substantial quantities to buyers from every state in the Union. Since most of them were in the business of buying and selling such merchandise, they had every incentive to know the particular uses to which their wares were appropriated, and their testimony as to chief use has great probative value. *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company, supra,* and cases cited.

On the record presented, the weight of the evidence establishes that the imported merchandise does not belong to the class of articles which is chiefly used for the service of meals, but to the class of novelty articles which is chiefly used for display or decoration. It is, therefore, classifiable as decorated chinaware, other than tableware, at 45 per centum ad valorem, under paragraph 212 of the Tariff Act of 1930, as modified, *supra.*

The protest is sustained, and judgment will be entered accordingly.